IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| TERRANCE DEBOSE | ) | |
| ℅ THE LAW OFFICE OF PAUL J. | ) | |
| CRISTALLO, LLC. | ) | |
| THE BROWNHOIST BUILDING | ) | CASE NO.: |
| 4403 ST. CLAIR AVENUE | ) | |
| CLEVELAND, OH  44103 | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | JUDGE: |
| -vs- | ) | |
| | ) | |
| CUYAHOGA COUNTY/CUYAHOGA | ) | |
| COUNTY COUNCIL | ) | |
| 2079 EAST NINTH STREET | ) | |
| CLEVELAND, OH  44115 | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| -and- | ) | (Refiled) |
| | ) | |
| | ) | **(JURY DEMAND ENDORSED** |
| ARMOND BUDISH | ) | **HEREON)** |
| CUYAHOGA COUNTY EXECUTIVE | ) | |
| Individually and in his official capacity | ) | |
| C/O CUYAHOGA COUNTY LAW DEPT. | ) | |
| 2079 E. 9TH STREET | ) | |
| CLEVELAND, OH  44115 | ) | |
| | ) | |
| -and- | ) | |

)
KENNETH MILLS )
Individually and in his official capacity )
℅ R. TODD HUNT )
WALTER HAVERFIELD )
1301 E. 9th STREET )
CLEVELAND, OH  44114 )
)
     -and- )
)
CLIFFORD PINKNEY )
Individually and in his official capacity )
℅ CUYAHOGA COUNTY PROSECUTOR )
OFFICE )
1200 ONTARIO STREET )
CLEVELAND, OH  44113 )
)
     -and- )
)
GEORGE TAYLOR )
Individually and in his official capacity )
℅ CUYAHOGA COUNTY PROSECUTOR)
OFFICE )
1200 ONTARIO STREET )
CLEVELAND, OH  44113 )
)
     -and- )
)
ERIC J. IVEY )
Individually and in his official capacity )
℅ ROBIN M. WILSON )
ULMER & BERNE, LLP. )
1660 W. 3RD STREET )
CLEVELAND, OH  44113 )
)
     -and- )
)
TIMOTHY DUGAN )
Individually and in his official capacity )
℅ MICHAEL E. MURMAN )
14701 DETROIT AVENUE, STE. 555 )
LAKEWOOD, OH  44107 )

|  | ) |
| -and- | ) |
|  | ) |
| NICHOLAS EVANS | ) |
| Individually and in his official capacity | ) |
| ℅ JAMES M. POPSON | ) |
| SUTTER O'CONNELL, CO. | ) |
| 1301 E. 9TH STREET | ) |
| CLEVELAND, OH  44114 | ) |
|  | ) |
| -and- | ) |
|  | ) |
| JOHN DOES 1-5 | ) |
| CUYAHOGA COUNTY SHERIFFS DEPT. | ) |
| 1215 W. 3RD STREET | ) |
| CLEVELAND, OH  44113 | ) |

## **INTRODUCTION**

1. This case is brought to address violations and injuries stemming from the misconduct of various individuals, entities, officers, and other officials in connection with the March 22, 2019 beating of Plaintiff Terrance Debose.  Mr. Debose, an individual with mental health conditions, was wrongfully restrained and savagely beaten in the face and head.  He was then subject to further humiliation and violations of his Constitutional rights by being put in isolation, denied medical care, ignored and/or ridiculed by jail staff.  As a direct result of the actions of the individual Defendants, as well as a direct result of the unconstitutional customs, policies and/or practices of Cuyahoga County, Mr. Debose suffered immediate physical pain, injury, anguish, mental and emotional harm, as well as a loss of his dignity and of his rights as protected by the United States Constitution.

## JURISDICTION AND VENUE

2.     The Cuyahoga County Court of Common Pleas has jurisdiction because this matter includes state-law claims and involves a controversy in excess of $15,000.00. The Court has personal jurisdiction over all of the Defendants based on information and belief that the Defendants are located within Cuyahoga County.  Venue is proper based on the fact that all of the claims set forth herein took place in, or arose out of conduct within, Cuyahoga County.

## PARTIES

3.     Plaintiff Terrance Debose is a citizen of the United States and resides in Cuyahoga County, Ohio.

4.     Defendant Armond Budish is the Cuyahoga County Executive.  At all times relevant herein, Budish was acting in his official capacity.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is being sued in his individual as well as his official capacity.

5.     Defendant Kenneth Mills was the Director, Regional Corrections Cuyahoga County Sheriff's Department.  This Defendant was a Jail Supervisor who had supervisory authority over the Cuyahoga County Jail records, operations, staff and inmates. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is being sued in his individual as well as his official capacity.

6. Defendant Eric Ivey was the Assistant Warden of the Cuyahoga County Corrections Center. As the Sheriff, Pinkney had supervisory authority over the Cuyahoga County Jail records, operations, staff and inmates. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual as well as his official capacity.

7. Defendant Clifford Pinkney was at all times herein the Cuyahoga County Sheriff. As the Sheriff, Pinkney had supervisory authority over the Cuyahoga County Jail records, operations, staff and inmates. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual as well as his official capacity.

8. Defendant George Taylor was at all times herein the Director for the Cuyahoga County Corrections Center. As the Director, Taylor had supervisory authority over the Cuyahoga County Jail records, operations, staff and inmates. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual as well as his official capacity.

9. Defendant Timothy Dugan was at all times herein employed as a Corrections Officer or other security employee for the Cuyahoga County Corrections Center/Jail. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is being sued in his individual as well as his official capacity.

10. Defendant Nicholas Evans was at all times herein employed as a Corrections Officer or other security employee for the Cuyahoga County Corrections Center/Jail. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  He is being sued in his individual as well as his official capacity.

11. Defendant Cuyahoga County and/or the Cuyahoga County Council is a unit of local government organized under the laws of the State of Ohio.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

12. John and Jane Does 1-5 ("Does") are those individuals and entities whom, at all relevant times, were either employees, agents, or acting on behalf of Cuyahoga County or were acting under the supervision, agency and/or authority of Cuyahoga County and/or other Cuyahoga County Defendants.  Some or all of these "Does" are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  Some or all of these "Does" are being sued in their individual as well as their official capacity.

**FACTS**

13. Mr. Debose was booked into the Cuyahoga County Jail on March 22, 2019.

14. At the time of his booking, Mr. Debose suffered from mental health conditions including schizophrenia and bipolar disorder.

15. Cuyahoga County and its agents were fully aware of Mr. Debose's mental health conditions.

16. The fact that Cuyahoga County was well aware of Mr. Debose's history of mental health conditions is established by the fact that on or about March 6, 2015, a Cuyahoga County Court psychiatrist determined that Mr. Debose suffered from mental health conditions.

17. As a result of a Cuyahoga County Court psychiatrist diagnosing Mr. Debose with mental health conditions, his case was removed from the general population docket and was placed on the Mental Health Court docket.

18. After being booked into the County Jail, Mr. Debose was clearly in a state of mental and emotional distress.

19. Mr. Debose took off all of his clothes, covered himself with toothpaste, flooded his cell, and was yelling or otherwise speaking incoherently.

20. In response to Mr. Debose's breakdown, Sgt. Keglovic ordered Mr. Debose to be placed in a restraint chair.

21. No corrections officer or supervisor requested assistance from any psychiatrist, psychologist, counselor, or jail nurse.

22. No corrections officer or supervisor checked to see if Mr. Debose had been given his medication or if he had been subject to a proper mental health screening.

23. Rather, and in accordance with the customs, policies and practices of the Cuyahoga County Jail, Mr. Debose's was ordered to be placed in a chair with his arms and legs strapped down such that he was unable to move.

24.     Prior to entering his cell, Defendant Evans and/or C.O. Anderson instructed Mr. Debose to turn around, face the wall, and place his hands behind his back. Mr. Debose fully complied.

25.     Mr. Debose was placed in handcuffs without any resistance.

26.     Mr. Debose voluntarily complied with the orders given and did not engage in any physically aggressive behavior.

27.     Mr. Debose sat in the restraint chair and had his arms/wrists and legs tightly restrained - again, without any resistance or struggle.

28.     Prior to and after being placed in the restraint chair, Mr. Debose made offensive statements to the corrections officers present.

29.     In response, Defendant Evans and Defendant Dugan made offensive comments back to Mr. Debose.

30.     Having worked at the Cuyahoga County Jail, Evans and Dugan had been subjected to offensive comments in the past. It was not uncommon for inmates and corrections officers to make offensive comments.

31.     Prior to Mr. Debose being wheeled into a small, windowless cell (hereinafter referred to as the restraint room), Dugan placed a spit mask on Mr. Debose.

32.     Dugan and Evans later justified placing a spit guard on Mr. Debose by accusing him of spitting on Evans.

33.     Dugan and Evans were lying. In fact, Mr. Debose had not spit at all, let alone on one of the C.O.s.

34.     Despite the presence of body cameras and other surveillance footage, there is no evidence that Mr. Debose spit on anyone.  No spit was collected and no picture or video of any spit was recorded.

35.     Mr. Debose was then wheeled into the restraint room, a cement/cinder-block room with fluorescent light and essentially no other features.

36.     Once in the restraint room was alone with Dugan and Evans.

37.     After assuring himself that the restraint room was secure, Evans turned off his previously activated body cam.

38.     Again, Mr. Debose was naked but for a blanket and had his arms and legs restrained.  Mr. Debose lacked the ability to move and/or defend himself in any manner.  Mr. Debose did not, and could not, pose any risk of harm to Evans or Dugan.

39.     Evans then began pummeling Mr. Debose in the face and head, immediately inflicting severe physical pain and distress.

40.     Dugan, also in the restraint room, did not take any steps to physically intervene or otherwise prevent Evans from beating the helpless Debose.

41.     Dugan did not voice any objection or grab Evans in an attempt to prevent further harm to Mr. Debose.

42.     Rather, Dugan joined Evans' brutal assault by punching Debose in the head, also causing Debose severe physical pain and distress.

43. Evans, pursuant to the express instruction and direction of Cuyahoga County Jail Warden Eric Ivey, had turned off his body-cam so that his misdeeds would not be recorded.

44. The policy, custom and practice of Cuyahoga County Jail personnel turning off body-cams so as to destroy and/or eliminate evidence of misconduct was well known, approved of, implemented by, and otherwise condoned by Cuyahoga County Jail Director Kenneth Mills, Cuyahoga County Sheriff Clifford Pinkey, and Warden Ivey.

45. Fortunately, a surveillance camera in the restraint room was not turned off and recorded the entire, brutal attack.

46. Following this assault, Mr. Debose was left strapped in the restraint chair, bleeding, dazed and suffering for approximately four hours.  Mr. Debose's physical injuries and emotional state were completely ignored.  He was strapped down, beaten, and left to agonize without any medical attention.

47. Mr. Debose was eventually wheeled from the restraint room to the dispensary. While in the dispensary, he was given a cursory examination and virtually no medical treatment.

48. Mr. Debose, having just been brutally attacked, was literally begging for medical attention.  Mr. Debose repeatedly explained that he had been severely beaten but he was ignored.  Neither Nurse Ellism, Nurse Wheeler, Nurse Petit, Nurse McQueen nor Nurse Walker provided any substantive medical attention and none of them ini-

tiated a concussion evaluation protocol.  Instead, Mr. Debose was given an over-the-counter pain reliever and placed in solitary confinement.

49.     Mr. Debose's assault clearly shows that he, at a minimum, could have suffered a concussion, but no jail staff or medical provider bothered to request to see the video.  Rather, the entire medical staff simply decided to not believe Mr. Debose and/or to not even care if he was telling the truth.

50.     Mr. Debose had, in fact, suffered a concussion but he wasn't provided adequate medical care.

51.     Mr. Debose also began to have an even more severe mental/emotional breakdown while in the dispensary.

52.     Mr. Debose, still strapped into the inhumane contraption he was ordered into hours ago, was being ignored and disregarded.  He began to sob uncontrollably.

53.     Despite the fact that Mr. Debose was a mental health consumer who had just been inhumanely beaten and was evidencing an emotional breakdown, none of the health care providers or jail staff notified any psychiatrists, psychologists, counselors or other mental health professionals.  Rather, Mr. Debose was left to suffer physically, mentally and emotionally.

54.     The Constitutionally offensive conduct did not end on March 22, 2019.  Mr. Debose was taken from the dispensary to solitary confinement for approximately one week before he would receive medical attention and be evaluated for a concussion.

55.  According to Evan's incident report, which was allegedly completed on the day of the incident, March 22, 2019, Evans admits to hitting Debose "several times" while Debose was restrained.

56.  According to Dugan's incident report, which was allegedly completed on the day of the incident, March 22, 2019, Dugan admits to hitting Debose "a couple of times" while Debose was restrained.

57.  As such, and in addition to clear, objective video evidence of Mr. Debose being repeatedly beaten in the head, Cuyahoga County was aware Mr. Debose was telling the truth about the attack because Evans and Dugan admitted to the assault on the day of the incident.  Yet it took approximately one week of no medical attention and being held in isolation before anyone thought to offer Mr. Debose medical care.

58.  A further element of the retaliatory and cruel and unusual punishment inflicted upon Mr. Debose was the fact that he was denied the ability to take a shower for the entire time he was held in isolation.  Similar to Mr. Debose's requests for medical attention and medication, his requests to take a shower and to have adequate phone contact with his family were unlawfully denied.

59.  As indicated, Mr. Debose was diagnosed with a concussion and other injuries, some of which are permanent in nature.

60.  As a consequence of the Defendants' misdeeds, Mr. Debose suffered physical injuries, pain, suffering, emotional distress, mental anguish, and other economic and non-economic losses.

61.    Plaintiff submits that the denial of medical care, psychiatric care, medication, out-
       side contact, and the ability to take a shower, along with keeping Mr. Debose in
       isolation following this incident, was in direct response and retaliation for Mr.
       Debose calling jail personnel's attention to the fact that he had been unlawfully
       beaten by C.O.s while in a restraint chair.

62.    Several months before Mr. Debose's beating, the U.S. Department of Justice, by
       and through the U.S. Marshal's Office, conducted a thorough investigation and au-
       dit of the Cuyahoga County Jail.

63.    The final report of the U.S. Marshal's investigation, attached hereto as Exhibit 1
       and fully incorporated herein, set forth various findings.  Some of those findings
       relative to the Cuyahoga County Jail included:

       -       Cuyahoga County Jail staff failed complete intake screenings in a
               timely manner;

       -       Jail staff failed to report on health, safety and security measures;

       -       Jail staff and inmates feared repercussions for speaking candidly to U.S.
               Marshal investigators and U.S. Department of Justice agents;

       -       Comprehensive mental health appraisals were not conducted in a timely
               Manner;

       -       There existed a backlog of "Kites" (requests by inmates for medical and/or
               mental health care);

       -       No information regarding the six (6) inmate deaths reported to the U.S.
               Marshals was maintained by the Warden's Office;

       -       The Cuyahoga County Jail's staff training curriculum does not consist of
               policy review and identifying and reporting signs of detainee/inmate
               mental health decomposition;

- The denial of food, toilet paper and other essential items was used as a punitive measure against inmates.  Inmates were told to use their clothing for toilet paper.  Food was often withheld from prisoners and they were not provided other basic staples like pens and paper.

64. Even more significantly, the U.S. Marshals team discovered the following:

- "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches", as they escorted them to and from the interview location.  The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety."

(See, Quality Assurance Review of the Cuyahoga County Correctional Center conducted by the Department of Justice's U.S. Marshal's Office, attached hereto as Exhibit 1)

65. It is significant and shocking that the Cuyahoga County Corrections Officers would intimidate witnesses who were part of a U.S. Department of Justice/U.S. Marshal's investigation.  But it is almost incomprehensible that the Cuyahoga County Jail's staff were so brazen as to intimidate witnesses in front of and within ear-shot of these federal investigators.

66. The same culture and perverse environment that would allow witness intimidation in front of U.S. Marshal investigators is the same culture and environment that emboldened Officer Evans to turn off his body camera so that he and Officer Dugan could beat the restrained Mr. Debose.

67. Further evidence of unconstitutional customs, policies and/or practices within the Cuyahoga County Jail include those facts which form the basis for charging former Cuyahoga County Jail Associate Warden Eric Ivey with felony charges for tampering with records and falsification.

68. Defendant Warden Ivey ordered Cuyahoga County Corrections Officers to turn off their body cameras. Ivey's actions, made in his official capacity and as a policy maker for Cuyahoga County, created an environment of corruption, neglect and abuse. By instituting such an offensive policy (eliminating the evidence of inmate abuse and other criminal acts), Ivey all but guaranteed violations of the Constitution such as those suffered by Mr. Debose.

69. In addition to the failings detailed in the U.S. Marshal's Report, the unconstitutional policies, customs and practices of the Cuyahoga County Jail are evidenced by the copious number of shocking incidents, some of which are set forth as follows:

- **Ms. Chantelle Glass**

Ms. Glass was taken into the Cuyahoga County Jail based on an old misdemeanor warrant out of New Jersey. Ms. Glass requested to call her family so they could find a lawyer to resolve this issue. The jail staff refused. In retaliation for repeatedly requesting to use the phone, Ms. Glass was manhandled and forced into a restraint chair despite the fact that she was being compliant. Thereafter, Ms. Glass was violently struck and had an entire can of pepper spray emptied into her face, all while Ms. Glass was restrained. When asked

why she was maced, C.O. Clark responded "Because you talk too much."
Similar to Mr. Debose, following Ms. Glass' unlawful abuse, she was denied
adequate medical care and was forced to remain strapped helplessly to the re-
straint chair.  See, USDC, ND, Ohio 1:19-cv-01825.

- **Mr. Joshua Castleberry**

Mr. Castleberry snuck an extra bologna sandwich from the commissary with
the intention of eating it in his cell.  When he was caught, Mr. Castleberry
threw the bologna sandwich at corrections staff.  In response, corrections offi-
cers John Wilson and Jason Jozwiak handcuffed Mr. Castleberry and then sav-
agely "smashed Mr. Castleberry's face so violently into the ground that his
front teeth came out of his nose.  They placed him in a restraint chair and
jammed a mask over his broken face to conceal their assault from medical
staff."  Similar to Mr. Debose, Mr. Castleberry was unlawfully abused and
subsequently denied adequate medical care.  See, USDC, ND, Ohio 1:20-
cv-00218.

- **Mr. Tyrone Hipps, Jr.**

On November 1, 2018, Mr. Hipps, a Muslim inmate in the Cuyahoga County
Jail, was interviewed by the U.S. Marshal's Service Quality Assurance Re-
view Team regarding the conditions in the Cuyahoga County Jail.  Mr. Hipps
provided information regarding the abuses and inhumane conditions inside the
jail.  Two days later, a Special Response Team (SRT) member, Officer Perdue,
refused to let Mr. Hipps pray in an area and in a fashion where he had previ-

ously been allowed.  In direct retaliation for providing information to the U.S.

Marshal's investigators, and in violation of Mr. Hipps' First and Fourteenth

Amendment rights, Perdue put Mr. Hipps in a chokehold and slammed him

headfirst into the ground.  Officer Perdue also altered his bodycam so as to

prevent his abuse from being recorded.  Similar to Mr. Debose, Mr. Hipps was

further retaliated against by being placed in solitary confinement ("the hole")

and was also denied medical care.  See, USDC, ND, Ohio 1:19-cv-02815.

- **Ms. Corrione Lawrence**

During the course of being processed into the Cuyahoga County Jail, Mr.

Lawrence responded to questions in Spanish.  The booking officer and other

jail staff decided that Mr. Lawrence was simply being difficult by responding

in Spanish so, as punishment, they placed him in the restraint chair.  Similar to

Mr. Debose, Mr. Lawrence was strapped down to a chair and forced to sit in a

freezing cold room for approximately four (4) hours as punishment.  There-

after, Mr. Lawrence was placed in a pod with his cousin's murderer despite the

fact that Mr. Lawrence specifically asked to be placed in any other pod except

the one where this murderer was housed.  Mr. Lawrence feared he would be

attacked.  Not surprisingly, the man who murdered Mr. Lawrence's cousin at-

tacked Mr. Lawrence, but he was never punished or brought to justice.

Rather, Mr. Lawrence was physically beaten by corrections officers and sus-

tained serious injuries.  He was thereafter denied adequate medical attention.

Similar to Mr. Debose, Mr. Lawrence was further retaliated against by being

placed in isolation and was denied the ability to take a shower.  See, USDC, ND, Ohio 1:19-cv-02411.

- **Mr. Glenn Mayer, Jr.**

Mr. Mayer suffered from a neurological condition which caused him to have involuntary spasms or "twitches".  The staff at the Cuyahoga County Jail knew of Mr. Mayer's condition.  While Mr. Mayer was being handed medication, he experienced a spasm.  Corrections Officer Hayes witnessed this twitch and manhandled Mr. Mayer, squeezing his neck and slamming Mr. Mayer's elbow.  The physical assault on Mr. Mayer went unpunished and Hayes continued to harass and intimidate Mr. Mayer.  Further, Mr. Mayer was denied adequate medical care despite an obvious need.  See, USDC, ND, Ohio 1:19-cv-02620.

- **Mr. David Frunza**

Mr. Frunza was an inmate in the Cuyahoga County Jail who suffered from an epidural abscess and a spinal infection.  Mr. Frunza's condition was obvious and objectively serious.  Despite the seriousness of his conditions, the staff at the Cuyahoga County Jail failed to treat Mr. Frunza.  As a result of the Cuyahoga County Jail staff failing to treat Mr. Frunza's serious medical condition, he suffered excruciating pain for approximately forty-two (42) days and now has permanent physical damage and emotional distress.  See, USDC, ND, Ohio 1:19-cv-02330.

- **Tonya Clay, et al.,**

On May 17, 2019, Ms. Tonya Clay and other Plaintiffs filed a lawsuit against Cuyahoga County and various other officials and individuals based on the inhumane conditions inside the Cuyahoga County Jail.  Plaintiffs' Complaint details how Cuyahoga County has adopted customs, policies and practices which are inhumane, pervasive and unconstitutional.  As a direct and proximate result of these same unconstitutional customs, policies and practices, Mr. Debose suffered physical injury, emotional distress, violations of his Constitutional rights, and other losses and damages.  See, See, USDC, ND, Ohio 1:18-cv-02929.

70. The aforementioned individuals all experienced a violation of their Constitutional rights either as a result of abuse at the hands of corrections officers, or were otherwise treated with deliberate indifference to a serious medical problem.

71. However, the aforementioned incidents do not constitute an exhaustive list.   There have been other similar incidents of excessive force, the denial of medical care, and the neglect and abuse of inmates with mental health issues - all of which demonstrate an environment of unlawful policies, customs and practices.

72. The treatment of Plaintiff, before, during, and after his restraint-chair beating, was done with pure malice and utter indifference to Plaintiff's rights, safety and well-being.  The Defendants' conduct as described herein was consistent with institutionalized and widespread practices, policies, and/or customs of Cuyahoga County through CCCC.  These practices, policies, and/or customs were known and ratified, or should have been known by the Supervisor Defendants, Budish, Taylor

and Pinkney.  Such policies, practices, and customs of the CCCC specifically relate to the management of the CCCC.

73. On February 12, 2019, the Inspector General of the Cuyahoga County Agency of Inspector General issued a Report of Investigation related to the Cuyahoga County Corrections Center.  On April 25, 2019 this Report of Investigation was sent to Special Assistant Attorney General Mattew Meyer (who was also a Supervisor in the Public Corruption Unit of the Cuyahoga County's Prosecutor's Office) as a "Confidential Law Enforcement Referral Memorandum" related to an ongoing criminal investigation.  A copy of this entire Report and referral memorandum is attached hereto as "Exhibit 2" and will be referred to hereinafter as "Inspector Report", and citations to the Inspector Report shall be to the page number in the PDF attachment of the Exhibit.

74. Regarding the serious concerns of inmate safety, the Report begins by stating that, "A jail is not intended to provide a pleasant experience. But neither should it be a death sentence." (Report at 7). The Report related to the conditions of the CCCC during the relevant time period in which Plaintiff was in its custody, and referenced systemic problems with the CCCC dating back to at least 2012. The Report "revealed a fundamental failure of leadership, management and oversight." (Id. at 8). The CCCC existed with an impermissible overcrowded population since 2012, and at the time of the report the CCCC continued to function below the authorized staffing levels for correction officers, which as a result increases stress upon the COs and detainees due to increased need to red zone (Id.). The report notes that

"Deficiencies were also found in the provision of medical services. Medical staff reported that inmates were unable to receive necessary medical care in a timely fashion. At times request for medical care were allegedly delayed, ignored or deleted from the case tracking system without receiving care." Because of a change in CO staffing, medical personnel can be stymied from providing care due to a lack of sufficient COs assigned to the medical center."

(Id. at 8-9).

75.  The Report further found a lack of oversight within the CCCC management (Report at 9). Notably, the Report sets forth that during the time Plaintiff was detained in the CCCC and before: (A) CCCC was found to be in violation of Federal standards parallel to analogous State Standards (Report at 21); (B) CCCC's chain of command was consistently not respected (Id. at 21-22); (C) There was a lack of experience among CCCC's staff (Id. at 22-23); (D) CCCC's management ignored objective data of problems (Id. at 24); (E) CCCC's management displayed contempt of its correction officers (Id. at 24-25); (F) A perception of retaliation existed among CCCC's correction officers (Id. at 25); (G) There was a lack of communication of CCCC's policies (Id. at 26); (H) There was a systemic failure to correct overcrowding (Id. at 27-28); (I) Inadequate planning was in place for CCCC's housing, staffing, food, uniforms, and health (Id. at 28-29); (J) Staffing levels were below average & problems of turn-over, call-offs, which lead to increased red-zoning (Id. at 29-35); (K) There was a problem with access to medical care based on the delay and denial in the delivery of care (Id. at 36-38); (L) A fear of retaliation existed among CCCC employees (Id. at 39-42); (M) There was a failure of jail oversight (Id. at 42-50); (N) Health & safety problems were present

– including hazardous areas, used food as punishment toward inmates, food service, limiting inmates to one roll of toilet paper per week, mold and sanitation (Id. 50-57)

76.  Based on the systemic problems related to the management policies, custom and practice of the CCCC, the Report made a number of specific recommendations related to corrections to the CCCC's: (a) management & leadership, (b) oversight, (c) whistleblower protection to decrease fear of retaliation and increase responsiveness, (d) inmate capacity, (e) medical care, (f) staffing, and (g) the jail's physical condition (Report at 9-12).

77.  At all times pertinent to the time Plaintiff was a pretrial detainee in the CCCC, based on the findings and recommendations in the Report Defendant Cuyahoga County and its management at the CCCC had in place a policy by way of custom, practice and/or ratification at the CCCC an environment whereby its detainees were subject to punishment due to at least the overcrowding condition and understaffing that increased stress on CO's and inmates, lack of experience on the part of CCCC staff, the conduct of CCCC management to ignore problems and its provision of inadequate planning related to the health and safety of its inmates, a lack of communication of CCCC polices, and by the failure of oversight in the CCCC's jail facility.

78. At all times pertinent to the time Plaintiff was a pretrial detainee in the CCCC, based on the findings and recommendations in the Report Defendant Cuyahoga County and its management at the CCCC had in place a policy by way of the fail-

ure to train its staff that subjected its pretrial detainee's to an environment of excessive force, punishment and/or the denial and/or delay in the delivery of medical care due to at least the failure of its staff to follow the proper chain of command, the lack of experience among CCCC's staff, its management display of contempt toward its correction officers, the failure to communicate CCCC policies, and by the failure of oversight in the CCCC jail facility.

79. Further, the U.S. Marshals Service found the following deficiencies in its October through November 2018 investigation of the CCCC revealed at least the following at page 35 of its report: (A) CCCC staff failed to use best practices for confrontation avoidance, which included the assessment of medical needs of those involved, (B) they failed in the requirement to use written reports when of force was used, (C) over 100 detainee/inmate interviews revealed strong and consistent allegations of brutality, punishment, and cruel treatment of CCCC's jail security.

80. The aforementioned Report and Investigation show that Cuyahoga County has a custom, policy, and practice of physically punishing its inmates, including pretrial detainees without just cause to use force, and in the failure to provide timely medical care to CCCC inmates.

81. In particular, the use of force on a restrained and helpless pretrial detainee, as inflicted upon Plaintiff, is consistent with Defendant Cuyahoga County's custom, policy, pattern, and practice of such unlawful force to retaliate against, punish, and abuse inmates indiscriminately, as occurred with other pre-trial detainees such as Chantelle Glass.

82. In November 2018, a number of judges for the Court of Common Pleas for Cuya-
hoga County wrote to CCCC's jail administration/management about the poor
conditions of the Jail. One judge said, "The County's indifference to the dangers
created by failing to meet the needs of the very fragile and volatile prison popula-
tion must end." Other judges spoke about and criticized the woefully inadequate
medical care in the CCCC jail. The presiding judge of the Court of Common
Pleas for Cuyahoga County at the time provided an editorial that identified
placement in the CCCC jail facility as cruel and unreasonable punishment.

83. The aforementioned problems at the CCCC have existed for years and demon-
strate a consistency with the treatment of Plaintiff and demonstrates a policy of
inaction on the part of Defendant Cuyahoga County and its management and su-
pervisors at the CCCC toward the rights of its pretrial detainees to be free from
punishment, excessive force and/or from the denial and/or delay of the delivery of
medical care. Other individuals in Plaintiff's same or similar situation have re-
ceived the identical treatment at the CCCC for a number of years.

84.  A number of other incidents are known that are similar to Plaintiff's experience,
that is, of being the victim of unlawful force after being placed in a restraint chair,
or having the restraint chair used as punishment, as a pretrial detainee of CCCC:

    (A) In January 2015, Lucille Dumas was forced to the ground when a CCCC
    and was forcibly placed into a restraint chair where she suffered further abuse.

    (B) In July 2018, inmate Chantelle Glass was placed in a restraint in a chair by
    a CCCC Cpl because she talked too much and was thereafter subjected to
    force while restrained.

(C) In July 2018, inmate Blanche Hill was confined to a restraint chair in the CCCC for 12 hours with no restroom access.

(D) In October 2018, CCCC inmate Joseph Sawyer confined to restrain chair and thereafter sustained physical injury due to ineffective decontamination.

(E) In December 2018 CCCC inmate Antoinie Blackhead was also pepper sprayed, beat, and confined to a restraint chair.

(F) In December 2018, CCCC inmate Margaret Jackintell was pepper sprayed and confined to a restraint chair because she protested actions and conditions at the CCCC – abuse of other inmates. She was restrained for 12 hours and denied food, water, or the ability to use the restroom.

(G) In April 2018, CCCC inmate Michael Rotary-Nugent was pepper sprayed, physically abused, and strapped into a restraint chair when he as asked for extra milk during breakfast – after which jail staff failed to effectively decontaminate him.

(H) In November 2018, Defendant Cpl Evans was to have turned off his body camera while he beat CCCC inmate Corrionne Lawrence. Defendant CO Smith has been previously alleged to have laughed at the evidence of assault of Corrionne Lawrence and act not to report such conduct, and failed to provide medical assistance to Mr. Lawrence and subsequently threaten Mr. Lawrence with retaliation. CO Smith has also been alleged to use excessive force in November 2018 upon CCCC inmate Timothy Bennett. (I) In November 2017, CCCC inmate Chariell Glaze was pepper sprayed, restrained, and physically accosted by several CCCC COs.

These and other treatment of these individuals is consistent with the CCCC's custom, policy, practice, and practice of using excessive force as punishment and otherwise victimizing and abusing individuals it detains.

85.  The failure of Defendant Cuyahoga County and its management and supervisors at the CCCC to investigate physical force used upon Plaintiff by pepper spray and other means, his living conditions and/or the denial and/or delay in the delivery of

medical care, and by its failure to address the aforementioned problems at the CCCC that have existed for years, by ignoring objective data, failing to adequate plan for the health and safety of its inmates, and the failure of jail oversight demonstrates that the CCCC jail faculty became so inadequate that conduct of punishment against its pretrial detainees constitutes a ratification of such conduct.

86. In 2019, now former warden Defendant Ivy was indicted and plead guilty to obstruction of justice and falsification related to the performance of his duties at the Jail. This occurred after he was demoted and resigned his position.

87.  The former director of corrections Defendant Mills, resigned his position at the CCCC in November 2018 just before the scathing U.S. Marshal Service Report regarding the deplorable conditions of the CCCC jail facility. Defendant Mills was later indicted on charges related to the performance of his duties at the CCCC jail including tampering with evidence, falsification, and dereliction of duty for making its jail unsafe by failing to provide adequate food, clothing, bedding, shelter, and medication attention.  On September 10, 2021 Defendant Mills was found guilty on two counts of falsification and two counts of dereliction of duty.

88.  For all claims set forth below, Plaintiff alleges on information and belief and based on information in the aforementioned Report that the Supervisor Defendants, and Defendants Budish, Mills, Ivey, Pinkey, Taylor, and Cuyahoga County at no time took any effective action and/or were deliberately indifferent in preventing the personnel of the CCCC from engaging in such conduct. This allegation and/or other factual contentions are likely to have evidentiary support after a

reasonable opportunity for further investigation and discovery. These same Defendants failed to meaningfully investigate issues that lead to the claims set forth below.

89. Defendant Cuyahoga County tolerates the use of excessive force. Based on previous instances of unjustified use of excessive force, it had notice of a pattern of constitutionally offensive acts by its staff, but failed to take any remedial steps in response. The culture of punitive violence cultivated in the CCCC was apparent to Federal investigators who assessed the faculty in October through November 2018. This culture and environment and the identification of problems and recommendations need at the CCCC was also apparent to Inspector General of the Cuyahoga County Agency of Inspector General who issued a the aforementioned Report of Investigation.

90. Based the aforementioned allegations, Plaintiff further alleges that the Supervisor Defendants, and Defendants Budish, Mills, Ivey, Pinkey, Taylor, and Cuyahoga County failed to adequately train and/or supervise the other Defendants in the exercise of their functions including, but not limited to, the conduct described herein. Said failure to train by these Defendants was malicious, reckless, and/or done with a deliberate indifference as to the rights of Plaintiff and other similarly situated individuals.

91. The Supervisor Defendants, and Defendants Budish, Mills, Ivey, Pinkey, Taylor, and Cuyahoga County based on the failure of the CCCC's management oversight and failure of communication did not adopt a policy or practice to prevent the

other Defendants from the use of excessive and unreasonable force against Plaintiff.

92. By its continued toleration of and sanction of such a persistent and widespread policy, practice, pattern, and custom of its staff including COs, Cps, and Sgts using excessive force against individuals in custody under which Plaintiff was victimized, Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

93. In addition to the threat for Plaintiff of punitive violence, the CCCC inmate population also lived with deplorable conditions including acute overcrowding, lack of medical care, inadequate nutrition and hygiene, vermin infestation, and other horrific conditions. The CCCC's jail facility failed to meet minimum standards required of it under Section 5120:1-8 of the Ohio Administrative Code, and/or the Federal Performance Based Detention Standards of the United States Department of Justice.

94. The conduct of Defendants, as described herein, was malicious, intentional, reckless, and/or done with deliberate indifference as to the well known and firmly established Constitutional rights of Plaintiff.

95. The conduct of the Defendants as alleged herein was conduct which reasonable officers, nurses supervisors, wardens, directors, and sheriffs would have known to be in violation of Plaintiff's clearly established Constitutional rights. The action or inaction of all supervisors as alleged herein was conduct that reasonable supervisors would have known to be in violation of Plaintiff's clearly established Consti-

tutional rights. The conduct as alleged herein was known or should have been known and/or was ratified by Defendant Cuyahoga County.

96. Supervisors Budish, Mills, Ivey, Taylor, Leiken, and Dr. Tallman are directly responsible for Plaintiff's injuries.

97. Under County Executive Budish's direct supervision and control, and acting pursuant to Budish's express direction and plans, Director Mills dramatically reduced staffing levels at the jail despite the fact that he knew these reductions would result in the deprivation of inmates' Constitutional rights.  Budish and Mills knowingly implemented the practice of "red zoning" despite the fact that this practice had directly and proximately caused inmates to suffer a loss of rights, injuries, and even death.  Despite becoming fully aware and appreciating that his staffing policies, procedures, and practices were the direct and proximate cause of Constitutional violations, Budish and Director Mills refused to change these policies.

98. Indeed, and as evidence that Budish and Director Mills were fully aware that these policies, procedures, and practices were directly and proximately resulting in the violation of inmates' rights, Director Mills issued directives that Corrections Officers and other staff lie about their jail "rounds logs." Director Mills also intentionally misled other government officials, including U.S. Marshalls, relative to the number of Corrections Officers and other staff who were on shift at any given time.  All of this was accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.  This unlawful

policy, procedure, custom, and/or practice was known to have directly caused injuries, damages, and harm *prior to* Plaintiff's injuries in March, 2019..

99. These and other unlawful policies, customs, practices, and procedures were brought to the everyone's attention by the U.S. Marshal's report in November 2018. However, according to multiple witnesses who have since come forward during the course of the State of Ohio's criminal investigation into the Cuyahoga County Jail, these unlawful policies, including but not limited to staffing, were devised, implemented, and enforced by Director Mills. All of this was also accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

100. Evidence of how Director Mills' unlawful staffing policies directly led to Plaintiff's restraint-chair beating and injuries is also evident, in part, from the testimony offered at the criminal trial of former Director Mills. Defendant and former C.O. Tim Dugan testified that as a result of CCCC's policies, procedures and customs, the Cuyahoga County Jail became an intolerable and dangerous place to work. "Red Zoning" and "Double Podding", as well as CCCC's policies regarding accepting 'fresh arrests' were all factors leading to detainee abuses and foreseeable harms such as what Plaintiff experienced. All of these policies were accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

101. Warden Ivey was also responsible for these unlawful staffing policies, procedures, practices, and customs which directly caused Plaintiff's injuries. Witnesses

interviewed as part of the broad criminal investigation into the Cuyahoga County
Jail revealed that Warden Ivey was fully aware and also knowingly implemented
the practice of "red zoning" despite the fact that this practice had directly and
proximately caused inmates to suffer a loss of rights, injuries, and even death.  De-
spite becoming fully aware and appreciating that his staffing policies, procedures,
and practices were the direct and proximate cause of Constitutional violations,
Warden Ivey refused to change these policies or confront Director Mills about
these policies.  Rather, Warden Ivey promoted and enforced these policies.  The
implementation of these policies, customs and/or practices was accomplished with
Budish's knowledge, consent, acquiescence, at his express direction, and under his
direct supervision.

102. Evidence that Warden Ivey was fully aware that his policies, procedures, and
practices were directly and proximately resulting in the violation of inmates'
rights, Warden Ivey issued and/or enforced directives that Corrections Officers and
other staff lie about their jail "rounds logs."  Warden Ivey also intentionally misled
other government officials, including U.S. Marshalls, relative to the number of
Corrections Officers and other staff who were on shift at any given time.  This un-
lawful policy, procedure, custom and/or practice was known to have directly
caused injuries, damages, and harm *prior to* Plaintiff's injuries in March, 2019.

103. Through the course of his criminal prosecution stemming from the State of
Ohio's investigation into the CCCC, Warden Ivey admitted to many unlawful poli-
cies, customs, practices, and procedures at the County Jail, including but not limit-

ed to staffing issues and "red zoning." Warden Ivey didn't deny that these and other unlawful policies, customs, practices, and procedures existed, and he didn't deny he was aware of them and did nothing to stop them.  Rather, Warden Ivey stated that he felt helpless to stop them.

104. Cuyahoga County Jail Director George Taylor was also aware of these unconstitutional policies.  Despite having knowledge of these issues, Director Taylor did nothing to change or revoke the practice of "red zoning," despite the fact that this practice had directly and proximately caused inmates to suffer a loss of rights, injuries, and even death.  Despite becoming fully aware and appreciating that the jail's staffing policies, procedures, and practices were the direct and proximate cause of Constitutional violations, Director Taylor refused to change these policies.

105. Director Taylor was fully aware that the jail's policies, procedures, and practices were directly and proximately resulting in the violation of inmates' rights.  Yet, Director Taylor didn't revoke or otherwise change the jail's policies, practices, customs, and policies that included Corrections Officers and other staff lying about their jail "rounds logs." These unlawful policies, procedures, customs, and/or practices were known to have directly caused injuries, damages, and harm *prior to* Plaintiff's injuries in March, 2019.  Director Taylor was aware of these problems and did nothing to fix them.  Director Taylor acquiesced in these and other unconstitutional policies, practices, and customs.  The implementation of these policies,

customs and/or practices was accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

106. At a minimum, these and other unlawful policies, customs, practices, and proce-dures were brought to Director Taylor's attention by the U.S. Marshall's report in November 2018.  However, according to multiple witnesses who have since come forward during the course of the State of Ohio's criminal investigation into the Cuyahoga County Jail, these unlawful policies, including but not limited to staffing, remained in place even after Director Mills was no longer in power.

107. The leadership at the Cuyahoga County Jail also knowingly and willingly de-vised, implemented, supported and acquiesced to training policies which were so objectively inadequate that they fell short of minimal legal standards.  These failed training policies also directly and proximately led to the injuries sustained by Plaintiff.

108. Director Mills created and enforced training customs, policies, practices, and procedures which were unreasonable and grossly inadequate.  Essentially, Director Mills' training policies for the Jail were non-existent, and it was his policies that led to Plaintiff's injuries.

109. Director Mills was fully aware that the jail staff's lack of training was below le-gal standards and was directly and proximately causing harm, injuries, and even death.  Yet, Director Mills did nothing to change or fix these policies.  Warden Ivey was also well aware of the training issues within the jail and how it was caus-ing injuries and death.  Warden Ivey also failed to do anything about these poli-

cies, customs, practices, and procedures except to enforce them.  Warden Ivey admitted that the jail's training was inadequate, but he did nothing about it.  Similarly, Director Taylor was also aware of these training deficiencies and unlawful customs, policies, practices, and customs, and despite the fact that these problems were made known to him and the general public in November 2018, Director Taylor did nothing about them.  Rather, he acquiesced, condoned, and enforced these policies.  As set forth in the interviews referenced herein, as well as the Marshall's report and other witness accounts, these deficient training policies were the direct and proximate cause of Plaintiff's injuries.  The implementation of these policies, customs and/or practices was accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

110. The leadership at the Cuyahoga County Jail also knowingly and willingly supported and acquiesced to the absence of necessary and legally required policies.  The CCCC's policies were so objectively inadequate that they fell short of minimal legal standards.  These inadequate policies, and the lack of necessary ones, also directly and proximately led to Plaintiff's injuries.

111. Director Mills was directly responsible for the CCCC having customs, policies, practices, and procedures which were unreasonable and grossly inadequate.  Essentially, Director Mills' policies for the Jail, specifically regarding restraining inmates and use of force, were non-existent, and it was his policies that led to Plaintiff's injuries.  The implementation of these policies, customs and/or practices was

accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

112. The practice of falsifying documents was a common policy, practice, custom, and procedure at the CCCC.  Director Mills and Warden Ivey created, implemented, promoted, enforced, and acquiesced to policies such as the C.O.'s forging log books and time sheets, misrepresenting times and personnel on log books and time sheets, destroying bodycam footage of medical emergencies so as to avoid civil liability or other scrutiny, lying about staff levels and overtime/payroll records to make it appear as if the jail had adequate staffing when it didn't, lying on or creating misleading incident reports, etc.  All of these unlawful policies, customs, practices, and procedures directly and proximately led to the injuries sustained by Plaintiff.  Director Taylor was aware of these policies, practices, customs, and procedures, including but not limited to C.O.'s stamping floor cards, and he did nothing to change or revoke them.  Rather, Director Taylor acquiesced to, promoted, implemented and/or enforced these policies.  The implementation of these policies, customs and/or practices was accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

113. Director Mills was fully aware that the jail staff's lack of training was below legal standards and was directly and proximately causing harm, injuries, and even death.  Yet, Director Mills did nothing to change or fix these policies.  Warden Ivey was also well aware of the training issues within the jail and how it was causing injuries and death.  Warden Ivey also failed to do anything about these poli-

cies, customs, practices, and procedures except to enforce them.  Warden Ivey admitted that the jail's training was inadequate, but he did nothing about it.  Similarly, Director Taylor was also aware of these training deficiencies and unlawful customs, policies, practices, and customs, and despite the fact that these problems were made known to him and the general public in November 2018, Director Taylor did nothing about them.  Rather, he acquiesced to, condoned, and enforced these policies.  As set forth in the interviews referenced herein, as well as the Marshal's report and other witness accounts, these deficient training policies were the direct and proximate cause of Plaintiff's injuries.  The implementation of these policies, customs and/or practices was accomplished with Budish's knowledge, consent, acquiescence, at his express direction, and under his direct supervision.

## FIRST CAUSE OF ACTION
## Excessive Force in Violation of the Fourteenth Amendment Under 42 U.S.C. §1983

114.  Paragraphs 1 through 113 are incorporated by reference herein as if fully rewritten.

115.  The actions of the Cuyahoga County Corrections Officers Evans and Dugan constitute an excessive use of force without legal justification.   The actions were unreasonable, malicious, deliberately indifferent, reckless, willful, wanton and shocking to the conscience, all of which deprived Mr. Debose, a pre-trial detainee, of his civil rights, as secured by the Fourteenth Amendment to the United States Constitution and through 42 U.S. C. §1983.  Further, the actions

were performed under color of law and deprived Mr. Debose of federally pro-
tected rights, in violation of 42 U.S.C. § 1983.

116.   As a direct and proximate result of the wrongful conduct of Defendants as set
forth herein, Plaintiff Mr. Debose suffered serious physical injuries, mental an-
guish, emotional distress and other damages.

## SECOND CAUSE OF ACTION
## Assault and Battery

117.   Paragraphs 1 through 116 are incorporated by reference herein as if fully
rewritten.

118.   The actions of the Cuyahoga County Corrections Officer Dugan and Evans as
set forth herein constitute assault and battery, as well as willful, wanton, inten-
tional, malicious and reckless conduct under the law of the State of Ohio.

119.   As a direct and proximate result of the assault and battery, Mr. Debose sus-
tained serious physical injuries, mental anguish, emotional distress and dam-
ages.

## THIRD CAUSE OF ACTION
## 42 U.S.C. § 1983
## (BUDISH, PINKNEY, MILLS, IVEY, TALOR, CUYAHOGA COUNTY, JOHN DOES 1-5)

120.   Paragraphs 1 through 119 are incorporated by reference herein as if fully
rewritten.

121.   Each Defendant identified herein has, under color of law, deprived Terrance
Debose of clearly established rights, privileges, and immunities secured by the

First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. These are Constitutional rights to which a reasonable person would have known. There rights include but are not limited to the right to due process, the right to be free from excessive force, the right to speak grievances without retaliation, and the right to be free from cruel and unusual punishment. Each Defendant violated 42 U.S.C. § 1983 in that Plaintiff Terrance Debose should not have been subjected to unlawful restraint, a vicious and unprovoked beating, the denial of adequate medical care, and retaliatory punishment for complaining about his abuse. The conduct of these Defendants constitutes deliberate indifference to the health and safety of Mr. Debose as well as conduct which shocks the conscience and is intolerable in a civilized society.

122. As a direct and proximate result of the failures, misconduct and omissions of these Defendants, Mr. Debose suffered serious physical injury as well as mental anguish and emotional distress.

**FOURTH CAUSE OF ACTION**
***Monell*: 42 U.S.C. § 1983**
**(BUDISH, PINKNEY, MILLS, IVEY, TAYLOR, CUYAHOGA COUNTY, JOHN DOES 1-5)**

123. Paragraphs 1 through 122 are incorporated by reference herein as if fully rewritten.

124. The Defendant Cuyahoga County's policies, practices, customs and habits relating to the conditions of confinement of inmates; the mistreatment of inmates with mental health conditions; the use of force, intimidation, fear, threats and

retaliation for complaining about these abuses; and the denial of inmates civil rights as protected by the United States Constitution were the moving force behind the violations of Mr. Terrance Debose's rights as secured by the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution.

125. These Cuyahoga County Defendants failed to institute adequate policies and procedures in order to prevent and/or eliminate substandard jail conditions.

126. These Cuyahoga County Defendants maintained policies, practices, customs and habits of discounting inmate complaints regarding the conditions of confinement of inmates; the mistreatment of inmates with mental health conditions; the denial of medical care, the deliberate indifference to the medical needs of inmates, the use of force, intimidation, fear, threats and retaliation; the use of force on restrained inmates, and the denial of inmates civil rights as protected by the United States Constitution.

127. The supervisory Defendants, including Defendant Cuyahoga County maintained policies, practices, customs and habits of discounting and marginalizing complaints of inmates with mental health conditions regarding the conditions of confinement of inmates; the mistreatment of inmates with mental health conditions; the use of force, intimidation, fear and threats; and the denial of inmates civil rights as protected by the United States Constitution. Specifically, Defendant Cuyahoga County maintained policies, customs, practices and habits of failing to investigate such inmate complaints. Defendant Cuyahoga County also maintained policies, customs, practices and habits of conducting inade-

quate investigations in those instances where there was an investigation of an inmate's complaint.  Further, Defendant Cuyahoga County maintained policies, customs, practices and habits of disproportionately finding in favor of Cuyahoga County (its agents, officers and employees) and against inmates, in those instances where an investigation was conducted by the County.   Further, Defendant Cuyahoga County maintained policies, customs, practices and habits of failing to take any or adequate corrective action in those rare instances where an inmate's complaint was investigated to conclusion and the inmate's complaints were found to have been valid.

128.   Some or all of these Defendants were also final policy makers who failed to conduct meaningful investigations and take corrective actions relative to the unconstitutional and substandard conditions to which Mr. Terrance Debose was subjected, both specifically and historically.

129.   There also exists a pattern and practice of these Defendants failing to train, supervise, investigate and discipline the employees of the Cuyahoga County Corrections Center in relation to the unconstitutional conduct outlined herein and set forth in the "Quality Assurance Review of the Cuyahoga County Correctional Center" conducted by the Department of Justice's U.S. Marshal's Office, attached hereto as Exhibit 1.

130.   Despite the fact that these policymakers were expressly put on notice of these and other deficiencies within the Cuyahoga County Jail through the express findings of the U.S. Marshal's 2018 audit, including but not limited to the need

to train and supervise the Cuyahoga County Corrections Center Corrections Officers and employees and staff relative to use of force, the initial intake and physical screening, the provision of medical care, the treatment of inmates with mental health conditions and other matters related to the conditions of confinement within the Cuyahoga County Jail, they failed to adequately train and supervise their employees, agents and officers in that regard.

131. As a direct and proximate result of these failures, Terrance Debose suffered serious physical injury, mental anguish, emotional distress and other damages.

**FIFTH CAUSE OF ACTION**
**Willful, Wanton, Reckless Conduct**

132. Paragraphs 1 through 131 are incorporated by reference herein as if fully rewritten.

133. The Defendants acted in a malicious, reckless, wanton, bad faith and willful manner when they decided to ignore and fail to act on these unconstitutional and substandard conditions within the Cuyahoga County Jail despite having implied and express knowledge of the unacceptable conditions.  These Defendants willfully ignored inmate complaints, internal audits, external audits, and other information, data, evidence, and findings both recent and historical.

134. The Defendants' misconduct in this regard caused and/or contributed to an environment and culture of abuse, neglect, misdeeds, fear, intimidation, threats, cruelty, and violence.  As a direct and proximate result of these failures, Mr. Debose was subjected to a violent attack and a failure of adequate medical care.

135. These Defendants also failed to establish and enforce policies to protect inmates such as Mr. Debose from violence, threats and intimidation.

136. As a result of these Defendants' failures and misconduct, Mr. Debose sustained physical injury, mental anguish, emotional distress and a loss of his Constitutional rights. These Defendants are not insulated from liability based on the defense of immunity, set forth in Ohio Revised Code §2744.01 *et seq.,* due to the fact that they acted in a malicious, reckless, wanton, bad faith and willful manner.

## SIXTH CAUSE OF ACTION
### Emotional Distress

137. Paragraphs 1 through 136 are incorporated by reference herein as if fully rewritten.

138. Through their extreme and outrageous conduct, Defendants Dugan and Evans intentionally and/or recklessly caused Mr. Debose serious emotional distress.

139. Alternatively, Defendants Dugan and Evans knew or should have known that their actions would result in emotional distress and their actions did cause Mr. Debose emotional distress. Defendant Dugan and Evans' infliction of emotional distress was willful, wanton, reckless, malicious and/or in bad faith.

140. Further, Defendants Dugan and Evans' actions toward Mr. Debose were so extreme and outrageous as to go beyond all possible bounds of decency and were intolerable.

141.  Defendants Dugan and Evans' actions directly and proximately caused Mr. De-
bose psychic injury from which he suffers and will continue to suffer into the
future.

## DAMAGES

142.  Paragraphs 1 through 141 are incorporated by reference herein as if fully
rewritten.

143.  As a direct and proximate result of the Defendants' deeds and omissions, Plain-
tiff Mr. Debose has suffered and continues to suffer physical pain, emotional
distress, mental anguish and other losses.   Mr. Debose also suffered a loss of
his dignity and a violation of his rights secured under the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Terrance Debose prays for judgment against the Defen-
dants, jointly and severally, for:

(A)     Compensatory and consequential damages for all the injuries identified in
an amount in excess of Two Million Dollars ($2,000,000.00);

(B)     Punitive damages in an amount to be determined at trial for the willful and
malicious conduct of those Cuyahoga County Defendants whose actions, inactions, mis-
deeds, misconduct and other violations caused and/or contributed to Mr. Debose's in-
juries;

(C)     Attorneys' fees and the costs of this action and other costs that may be as-
sociated with this action; and

(D)      Any and all other relief that this Court deems equitable, necessary, and

just.

Respectfully submitted,

*/s/ Paul J. Cristallo                    .*
PAUL J. CRISTALLO (0061820)
The Law Office of Paul J. Cristallo, LLC.
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103
T: 440.478.5262
F: 216.881.3928
Email:  Paul@cristallolaw.com

COUNSEL FOR PLAINTIFF
TERRANCE DEBOSE

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Paul Cristallo
PAUL J. CRISTALLO
Attorney for Plaintiff Terrance Debose